******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* RASHID A. JOHNSON
(AC 39290)

DiPentima, C. J., and Keller and Bear, Js.

*Argued November 17, 2016—officially released March 7, 2017*

(Appeal from Superior Court, judicial district of New
Haven, Blue, J.)

*Daniel J. Foster*, assigned counsel, for the appel-

lant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, *Michael A. Pepper*, senior assistant state's attorney, and *Lisa M. D'Angelo*, assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Rashid A. Johnson, appeals from the judgment of conviction, rendered following a jury trial, of murder in violation of General Statutes § 53a-54a (a), felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes § 53a-134 (a) (2) and carrying a pistol without a permit in violation of General Statutes § 29-35.[1] The defendant claims on appeal that the trial court erred in (1) admitting hearsay testimony into evidence and (2) excluding evidence that the police failed to properly investigate another party whom they considered a suspect. We disagree. Accordingly, we affirm the judgment of conviction.

The evidence at trial revealed the following facts. On October 21, 2012, at 7:50 p.m., patrol officers of the New Haven Police Department responded to a 911 call reporting that a person had been shot at Brendan Towers, an apartment complex located at 461 Whalley Avenue. Upon arrival, police officers located the victim, Christian Garcia, who resided at an apartment on the second floor of Brendan Towers and was a known marijuana dealer. Garcia was pronounced dead at the scene; the cause of death was a gunshot wound. The area was secured and detectives processed the crime scene in which, among items of physical evidence, they located and seized four spent .40 caliber cartridge casings, all of which had been fired from the same handgun. They also located and seized three fired bullets, one of which was embedded in a door frame and the other two bore traces of what appeared to be wallboard and/or paint; they observed walls that bore indications of bullet damage.

On the same date, at approximately 8:02 p.m., police received a report that the defendant walked into Yale-New Haven Hospital, Saint Raphael Campus, with a gunshot wound to his left knee.[2] At the hospital, the defendant told responding Officer Jason Jackson of the New Haven Police Department that while he was walking on Whalley Avenue he heard three to four gunshots and felt a pain in his leg and "took off" to the hospital. Acting on this information, Jackson went to canvass the area for a blood trail or spent shell casings, but found neither. He found no evidence indicating that a shooting had occurred at that location.

Detective Nicole Natale of the New Haven Police Department, who had been investigating the death of Garcia, went to the hospital to determine if the shootings of Garcia and the defendant were related. The defendant told Natale that he had been shot in front of the Southern Hospitality Soul Food restaurant on the corner of Whalley and Ellsworth Avenues, and that he had decided to travel on foot to the hospital because he had no cell phone to call for assistance. Detectives,

however, examined the hospital surveillance camera footage, which showed the defendant arriving at the emergency room in an automobile. A subsequent investigation led police to the automobile owner, Tywan Samuels, who acknowledged that he had picked up the defendant on Norton Street and had driven him to the hospital on the evening of October 21, 2012.

On October 22, 2012, detectives interviewed Fernando Perez Morales (Perez), a resident of Brendan Towers, who was with Garcia moments before his death. During that interview, Perez provided the following information. On the morning of October 21, 2012, Perez bumped into Garcia in Brendan Towers at which time Garcia told him that he would call him later to come upstairs to his apartment to smoke marijuana together. When Garcia later called Perez, Perez left his first floor apartment and met Garcia in the hallway of the second floor. When Perez arrived, Garcia told him that he was meeting someone who was coming to purchase marijuana from him. Garcia explained that he wanted to have someone with him because he was concerned. When the customer arrived, Garcia was talking to someone who had called his cell phone. Perez described the customer as a young black man who was in his late teens to mid-twenties, stood several inches taller than Perez' height of five feet ten inches and was wearing a black hooded sweatshirt with a Monster Energy drink logo, black sweatpants and a "do rag" on his head. After Garcia hung up the phone, the man said he wanted eight bags of marijuana and asked Garcia to show him the product. Garcia handed the man seven bags of marijuana, the man handed them all back to Garcia and then pretended that he was going to take out money but instead pulled out a handgun. Garcia shoved the man into a corner. Perez fled down the stairwell to the first floor when he heard four or five gunshots.

During the interview, police showed Perez a photographic array to see if he could identify the man with the gun. Perez said he was not certain which photograph showed the man with the gun, but that photograph number three, which was a photograph of the defendant, looked most like him. During his trial testimony, Perez was also unable to say whether the defendant was the man he had seen with the gun and testified that he did not see the man fire the gun.

On October 23, 2012, after being released from the hospital, the defendant voluntarily went to the police station with detectives who conducted a video recorded interview. During the interview, the defendant was shown a photograph of Garcia in response to which he denied knowing Garcia and having any dealings with persons in the Brendan Towers. Next, the defendant denied having a cell phone, but provided the police with a number after telling them that he had lost the phone

on the morning of October 21, 2012. Shortly after the defendant left the police station at noon, his cell phone, which had been inactive during his hospitalization, was activated and used to place a call to a phone that was registered to the mother of a female acquaintance of the defendant. In addition, the police obtained cell phone records from the defendant's cell phone that revealed several outgoing and incoming calls throughout the entire day of October 21, 2012. The cell phone records also confirmed that there was a cell phone call between the defendant and Garcia moments prior to the murder. Moreover, detectives interviewed Garcia's father who, after being shown seven photographs, identified the photograph of the defendant as a person who had stayed at Garcia's apartment in Brendan Towers in the past.

After further investigation, on May 6, 2013, the police arrested the defendant pursuant to a warrant charging him with Garcia's murder. In February, 2014, an intelligence officer employed by the Department of Correction reviewed a letter that had been handwritten by the defendant while he was incarcerated at the Northern Correctional Institution. The letter was dated February 6, 2014, and addressed to Christopher Graham by his street name "Ugg" and was contained in an envelope addressed to Graham's girlfriend in New Haven. The letter provided in pertinent part: "They don't got shit. It's just this one dumb ass Poppy[3] that live in them buildings where the freaking shit went down. His name Fernando Perez. His brother stay up there, he live wit[h] him. Ro might know what door he live at, but be smart bro, because wit[h]out him, they hit,[4] because wit[h] him they all set . . . ." The defendant put his correct name and inmate number on the letter. The parties stipulated that this letter had been written by the defendant.

Following a trial, the jury returned a verdict finding the defendant guilty of murder, felony murder, robbery in the first degree and carrying a pistol without a permit.[5] The court sentenced the defendant to forty years of incarceration, followed by ten years of special parole. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the trial court committed harmful error in admitting hearsay testimony into evidence. Specifically, the defendant challenges the admission of certain portions of Jackson's testimony in which he stated that no one in the Southern Hospitality Soul Food restaurant reported hearing or seeing gunshots. The defendant claims this statement suggested to the jury that one or more restaurant patrons communicated to Jackson, whether verbally or nonverbally, that they had not heard or seen gunshots fired, which was offered to prove that these patrons had not, in fact, heard or seen gunshots fired.

The following additional facts are relevant to our analysis. As previously noted, Jackson was the police officer who responded to the hospital to investigate the report of a gunshot victim, namely, the defendant. After speaking with the defendant, who reported being shot on Whalley Avenue near the Southern Hospitality Soul Food restaurant, Jackson left the hospital to canvass Whalley Avenue between Ellsworth Avenue and Norton Street in an attempt to locate the crime scene, whether it be "any shell casings from a weapon . . . a blood scene . . . and [to] . . . try to interview any people that may have witnessed something."

During direct examination of Jackson, the prosecutor asked whether he had received any information while canvassing in and around the Southern Hospitality Soul Food restaurant. In response, Jackson began to testify: "The only information I got was somebody put" before he was interrupted by defense counsel's objection. In considering defense counsel's objection, the trial court stated: "Well, I think the answer—the question put can be answered yes or no. Did you get any information? Yes or no?" Jackson then responded in the affirmative. The prosecutor probed further as to Jackson's canvass of the Southern Hospitality Soul Food restaurant, and asked him whether anyone in the restaurant reported to him that they had heard or seen gunshots.[6] When defense counsel objected, the prosecutor responded that the question could be answered with a yes or no response. The court then overruled defense counsel's objection and permitted Jackson to answer the prosecutor's question with a yes or no response. After the prosecutor repeated the question: "Did anyone say that they had heard or seen any gunshots," Jackson responded: "No one reported that sir." Defense counsel then moved to strike the answer on hearsay grounds. In denying defense counsel's request to strike, the court expressly stated that there was no out-of-court statement and therefore no hearsay issue.[7]

On appeal the defendant claims that, when considered together, Jackson's testimony that (1) he made an inquiry as to whether any patrons at the Southern Hospitality Soul Food restaurant had heard or seen shots fired; (2) he did receive information in response to that inquiry; and (3) no one responded in the affirmative, described the content of "a statement, other than one made by the declarant while testifying at the proceeding, [which was] offered in evidence to establish the truth of the matter asserted" and was thus inadmissible pursuant to our rules governing hearsay. See Conn. Code Evid. § 8-1 (3).

We begin by setting forth our well established standard of review for the defendant's evidentiary claim. "To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. For exam-

ple, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Foster*, 293 Conn. 327, 333–34, 977 A.2d 199 (2009). "Accordingly, in order for the defendant to succeed on appeal, we must not only find that the court abused its discretion in admitting the disputed evidence but, also, that the defendant suffered harm as a result of the court's ruling." *State* v. *Kerr*, 120 Conn. App. 203, 215, 991 A.2d 605, cert. denied, 296 Conn. 907, 992 A.2d 1136 (2010).

Before analyzing the defendant's claim, we first summarize the relevant law regarding hearsay. "Hearsay means a statement, other than one made by the declarant while testifying at the proceeding, offered in evidence to establish the truth of the matter asserted. . . . Hearsay is generally inadmissible unless an exception in the Code of Evidence, the General Statutes or the rules of practice applies." (Citations omitted; internal quotation marks omitted.) *State* v. *Foster*, supra, 293 Conn. 334.

For the purpose of resolving this claim we will assume, without deciding, that the trial court improperly admitted hearsay statements through the testimony of Jackson where he stated that no one in the Southern Hospitality Soul Food restaurant reported hearing or seeing gunshots. We thus turn to the question of whether the improper admission of Jackson's challenged testimony amounted to harmful error. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . We have concluded that a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . We previously have considered a number of factors in determining whether a defendant has been harmed by the admission or exclusion of particular evidence. Whether such error is harmless in a particular case depends [on] a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Considering these various factors, we have declared that the proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error." (Citations omitted; internal quotation marks omitted.) *State* v. *Bonner*, 290 Conn. 468, 500–501, 964 A.2d 73 (2009).

We conclude that the defendant has failed to show that the claimed impropriety by the court in admitting hearsay statements was in fact harmful. For the reasons that follow, our conclusion is premised on "the weight of the state's evidence absent the contested testimony, as well as the fact that the challenged testimony largely was cumulative of testimony from others . . . ." *State v. Kerr*, supra, 120 Conn. App. 215.

Turning first to whether the challenged testimony was largely cumulative, we compare the testimony of Natale, who also canvassed the area of Whalley Avenue near Brendan Towers in an attempt to locate the crime scene where the defendant alleged he was shot.[8] During direct examination by the state, Natale explained that on the night of the shooting she went to the hospital to gather information from the defendant concerning where he was shot and whether he knew who shot him.[9] Natale testified that the defendant told her that he was walking to his destination in the area of Whalley Avenue and Ellsworth Avenue when he heard gunshots and was shot in front of D'Amato's Fish Market. Natale further testified that after conversing with the defendant, she and two other detectives went to D'Amato's Fish Market on Whalley Avenue to look for any ballistic evidence, evidence of a shooting, broken windows, blood on the sidewalk and anything else that might have helped with the investigation. In response to the state's question concerning whether the detectives found anything during their canvass of Whalley Avenue, Natale responded that they did not find anything.

On direct examination by the prosecutor, Jackson testified, without any objection, in a very similar fashion. Specifically, Jackson testified that he did not find any evidence of cartridge casings, expended bullets, a weapon or blood in the location the defendant alleged he was shot.[10] In response to the prosecutor's question as to whether any other detectives found any evidence while canvassing the location where the defendant alleged that he was shot, Jackson replied in the negative. Jackson further testified that he went into the Southern Hospitality Soul Food restaurant to see if any patrons and staff had heard or seen any gunshots.

From our review, it is apparent that the testimony from Natale and the unobjected to testimony from Jackson is largely corroborative, e.g., despite two canvasses of the area by two different groups of police officers, the defendant's account of being shot on Whalley Avenue was not substantiated. Moreover, even without Jackson's challenged testimony, the jury might reasonably and logically have found from the testimony from Natale and the unobjected to testimony from Jackson[11] that no one reported the occurrence of a shooting at the location where and at the time that the defendant asserted he was shot.

In assessing the defendant's claim of harm, we look, as well, to the strength of the state's case absent the disputed statements. Our review of the record convinces us that the state presented a substantial amount of evidence tying the defendant to the crimes charged. As noted previously, the state submitted evidence from which the jury reasonably could have found that: (1) the defendant suffered a gunshot injury on the same night, at approximately the same time and that he arrived wounded at a hospital near to where Garcia was murdered;[12] (2) the defendant lied to the police about having a cell phone; (3) there was a record of the cell phone transactions between the defendant and Garcia on the day of the murder showing that their cell phones were in contact with one another; (4) the police were unable to discover any physical corroboration of the defendant's account of being shot on Whalley Avenue; (5) the defendant's intercepted prison correspondence contained admissions by the defendant; (6) the clothing worn by the person who killed Garcia and the clothing the defendant was wearing when he arrived at the hospital were similar; (7) the defendant knew Garcia; and (8) Rochelle Carmichael's testimony established that the defendant had spent time at her apartment in Brendan Towers.[13]

The defendant argues, nevertheless, that due to the weakness of the state's case, Jackson's testimony that no patrons at the restaurant reported hearing or seeing gunshots improperly influenced the jury. Specifically, the defendant claims that the improperly admitted hearsay statements in Jackson's testimony were the state's strongest evidence supporting its position that the defendant had lied about where he was shot, as there was no evidence that a witness positively identified the defendant as having been at the scene of the crime, in possession of a gun or shooting Garcia. We disagree.

Although the record reflects that Perez could not identify the defendant when he was shown a photographic array by police, that he was unable to identify the defendant in court and that the DNA evidence did not specifically link the defendant to the victim or the crime scene at Brendan Towers,[14] the challenged statements in Jackson's testimony were harmless even if improper. As noted previously, the state adduced substantial evidence from which the jury reasonably could have concluded that the defendant was guilty beyond a reasonable doubt of the charged crimes. Given the substantial evidence of the defendant's guilt, apart from the challenged portions of Jackson's testimony, we are not satisfied that the admission of this testimony caused harm to the defendant.[15]

In light of the foregoing, the challenged testimony from Jackson was "not likely to have distorted the jury's perception of the remaining evidence . . . or to have affected the outcome of the trial." (Citation omitted.)

*State* v. *Carpenter*, 275 Conn. 785, 840, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006). Thus, the admission of Jackson's challenged testimony was harmless. The defendant has failed to satisfy his burden of showing that any impropriety was harmful because it cannot be said, with fair assurance, that the error substantially affected the verdict.[16] See *State* v. *Kerr*, supra, 120 Conn. App. 214.

II

The defendant next claims that the trial court erred in excluding evidence that the police failed to properly investigate another party whom they considered a suspect in this case. Specifically, the defendant argues that he sought to introduce evidence that (a) the police continued to investigate Carmichael as a suspect after the defendant's arrest and (b) the police failed to test Carmichael's hands and clothing for gunshot residue. This evidence, the defendant asserts, would reveal deficiencies in the police investigation, giving rise to reasonable doubt as to his guilt. The defendant further contends that the trial court's error in excluding this evidence violated his right to present a defense pursuant to the sixth and fourteenth amendments of the United States Constitution. We disagree.

The following facts and procedural history are relevant to our resolution of this claim. At trial, the state called as a witness Carmichael, who lived in an apartment at Brendan Towers at the time Garcia was murdered. Carmichael testified that she was friendly with Garcia and would call him on both of his cell phones. Carmichael further testified that she also knew the defendant, whom she met through Graham. Graham had a key to Carmichael's apartment, and the defendant and Graham spent time in her apartment as well as the area surrounding Brendan Towers. Carmichael also testified that the defendant and Graham knew Garcia. On cross-examination by defense counsel, Carmichael acknowledged that she initially lied to the police about knowing Graham and his having access to her apartment. Carmichael testified that at the time of Garcia's murder, she was out with a friend, Crystal Mimms, who was later questioned by police. Carmichael testified that when she returned to Brendan Towers that evening she encountered police officers. She further acknowledged that she may have called Garcia at 10:45 a.m. on the day of his murder, but she did not recall telling this to the police.

The lead detective in this case, Bertram Ettienne of the New Haven Police Department, testified for the state regarding his interview with and investigation of Carmichael. Ettienne provided the following testimony. On the night of Garcia's murder, Ettienne met Carmichael at Brendan Towers. Carmichael voluntarily consented to a cursory search of her apartment, which did not produce anything of evidentiary value, and Carmi-

chael was not tested for gunshot residue. After the search of her apartment, Carmichael came to the police station where she was interviewed. While being interviewed by Ettienne, Carmichael lied about (1) not knowing the defendant's name when she was shown a photograph of the defendant; (2) being at Brendan Towers at one point during the day of Garcia's murder; (3) having had phone contact with Garcia on the day he was murdered; (4) knowing Graham; and (5) Graham's having a key to her apartment at Brendan Towers.

Ettienne confirmed that the police had obtained cell phone records for Carmichael, Garcia and the defendant. The cell phone records established that Carmichael's phone was used to call Garcia's phone at 8:17 p.m. on the night he was murdered. The cell phone records also showed that during the period which Carmichael claimed to have been with Mimms, Carmichael's cell phone received six telephone calls from Mimms. Ettienne also testified that after the defendant was arrested in May, 2013, the police continued its investigation.

During cross-examination of Ettienne, defense counsel asked: "Then ultimately, you couldn't rule out Rochelle Carmichael as a suspect in this case?" In sustaining the state's objection to defense counsel's question, the court noted that this is the "witness's opinion as to who may be a suspect" which is just an opinion and Ettienne was a fact witness. Defense counsel proceeded to ask Ettienne: "Well, you established that [Carmichael] lied to you," to which Ettienne responded in the affirmative. Defense counsel then asked Ettienne: "You never tested her hands or clothes for gunshot residue, and you did continue to investigate her—" at which point the prosecutor objected and the court sustained the objection.

During closing argument, defense counsel identified Carmichael as a third party culprit. After recounting the foregoing evidence to suggest reasonable doubt existed as to the defendant being the perpetrator of the charged crimes, defense counsel questioned that if Carmichael "had nothing to do with anything, [w]hy is she lying to the police . . . about what she did all day? Why did she lie about knowing people. . . . Why does she inject herself into this?" Moreover, defense counsel highlighted Ettienne's testimony that the investigation was ongoing after the defendant's arrest and he pointed out that the police had obtained cell phone records during the continued investigation. Accordingly, the court provided instructions relating to third party culpability in its final charge to the jury.[17]

On appeal, the defendant claims that the court erred in excluding the evidence that (a) the police had continued to investigate Carmichael after the defendant was arrested and (b) the police had failed to test Carmichael's hands and clothing for gunshot residue, as this

evidence demonstrated deficiencies in the police investigation. The state, in turn, contends that the record is inadequate for review of the defendant's claim that the court erred in excluding evidence that the police had continued to investigate Carmichael after the defendant was arrested. The state also argues that the evidence that the police failed to test Carmichael's hands and clothing for gunshot residue was already before the jury. With respect to this contention, the state asserts, and the defendant in his reply brief does not argue otherwise, that it understands the defendant's claim to be based upon the court's sustaining the state's objections to the following two questions that defense counsel posed to Ettienne: "Then ultimately, you couldn't rule out Rochelle Carmichael as a suspect in this case?" and "You never tested her hands or clothes for gunshot residue, and you did continue to investigate her." We will address each evidentiary ruling in turn pursuant to the following standard of review and legal principles that guide our analysis of the defendant's claim.

"At the outset, we note that our standard of review for the trial court's evidentiary rulings depends on whether the claimed error is of constitutional magnitude. . . . [I]f an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Randolph*, 284 Conn. 328, 377, 933 A.2d 1158 (2007). "We recognize, of course, that a violation of constitutional magnitude may be established even though there has not been a complete abridgement or deprivation of the right. A constitutional violation may result, therefore, when a constitutional right has been impermissibly burdened or impaired by virtue of state action that unnecessarily chills or penalizes the free exercise of the right." (Internal quotation marks omitted.) *State* v. *Jenkins*, 271 Conn. 165, 190, 856 A.2d 383 (2004).

As a preliminary matter, we set forth the relevant legal principles that govern the admissibility of evidence regarding the inadequacy of a police investigation. "[T]his court has recognized that defendants may use evidence regarding the inadequacy of the investigation into the crime with which they are charged as a legitimate defense strategy. . . . Conducting a thorough, professional investigation is not an element of the government's case. . . . A defendant may, however, rely upon relevant deficiencies or lapses in the police investigation to raise the specter of reasonable doubt, and the trial court violates his right to a fair trial by precluding the jury from considering evidence to that effect." (Citation omitted; internal quotation marks omitted.) *State* v. *Wright*, 322 Conn. 270, 282, 140 A.3d 939 (2016).

"A defendant, however, does not have an unfettered right to elicit evidence regarding the adequacy of the police investigation. The reference in [*State* v. *Collins*,

299 Conn. 567, 599, 10 A.3d 1005, cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011)] to *relevant* deficiencies or lapses in the police investigation suggests that the defendant must do more than simply seek to establish that the police could have done more. . . . Even when such evidence has some probative value, the court must consider whether the probative weight of the . . . evidence exceed[s] the risk of unfair prejudice to the [state] from diverting the jury's attention to collateral matters. . . .

"All of these factors must be evaluated by the trial court in determining whether the particular inadequate investigation evidence should be admitted. That evaluation necessarily is framed by the theory of the proffering party. It is well settled that [t]he proffering party bears the burden of establishing the relevance of the offered testimony. Unless a proper foundation is established, the evidence is irrelevant. . . . Relevance may be established in one of three ways. First, the proffering party can make an offer of proof. . . . Second, the record can itself be adequate to establish the relevance of the proffered testimony. . . . Third, the proffering party can establish a proper foundation for the testimony by stating a good faith belief that there is an adequate factual basis for his or her inquiry." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Wright*, supra, 322 Conn. 284–85.

a

The defendant first argues that the trial court erred in excluding evidence that the police continued to investigate Carmichael after the defendant was arrested for the charged crimes, and that such error was not harmless beyond a reasonable doubt. Specifically, the defendant asserts that the evidence that the police continued to investigate Carmichael demonstrated deficiencies or lapses in the police investigation that raised a reasonable doubt as to his guilt. We conclude that the defendant failed to preserve this claim of error for appellate review.

"[A] reviewing court may be unable to determine the propriety or effect of the excluded facts unless the substance of the proffered evidence is disclosed in the record." C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2017), § 1.29.4, p. 82, citing *State* v. *Benedict*, 313 Conn. 494, 512–15, 98 A.3d 32 (2014). Accordingly, "[a]n offer of proof is the accepted procedure to preserve the record for appeal if evidence is excluded." C. Tait & E. Prescott, supra, p. 82; see *State* v. *Conrod*, 198 Conn. 592, 597–98, 504 A.2d 494 (1986) (noting that offer of proof serves, in part, to create adequate record for appellate review). "An offer of proof, properly presented, serves three purposes. First, it should inform the court of the legal theory under which the offered evidence is admissible. Second, it should inform the trial judge of the specific nature of the offered evidence

so the court can judge its admissibility. Third, it thereby creates a record adequate for appellate review." (Internal quotation marks omitted.) *State* v. *Conrod*, supra, 597. "Without an adequate record to review the ruling of the trial court, this court must assume that the trial court acted properly." Id., 598.

In the present case, Ettienne did not answer the following questions from defense counsel: "Then ultimately, you couldn't rule out Rochelle Carmichael as a suspect in this case" and "You did continue to investigate her." No offer of proof appears in the record thereafter to reveal the content of the testimony the defendant sought to introduce.[18] See *State* v. *Yednock*, 14 Conn. App. 333, 345, 541 A.2d 887 (1988). An offer of proof was necessary in the present case because the record reveals neither the purpose of the excluded evidence nor what the expected testimony would have yielded.

The defendant, however, claims that an offer of proof is not necessary to preserve the record after every sustained objection. To support this contention, the defendant relies on our Supreme Court's decision in *State* v. *Barnes*, 232 Conn. 740, 748, 657 A.2d 611 (1995), and *State* v. *Santiago*, 224 Conn. 325, 330–31 n.6, 332, 618 A.2d 32 (1992), and argues that because the questions at issue were asked during cross-examination, they were leading questions, which by their nature indicate the response that counsel expected to elicit. We disagree.

Contrary to the view of the defendant, "*State* v. *Santiago*, [supra, 224 Conn. 330–31 n.6], does not support the proposition that no offer of proof was needed to establish the relevance of the testimony sought in the present case. As this court previously explained in *State* v. *Barnes*, supra, 232 Conn. 748, when we rejected the same proposition, [i]n light of our review of the record in *Santiago*, we concluded that the defendant's line of inquiry was clearly supported by the evidence and relevant to the witness' bias, despite the fact that the defendant had made no offer of proof. . . . Thus, in *Santiago*, the record independently was adequate to establish the relevance of [the] evidence sought to be elicited. . . . Indeed, in *Barnes*, the court cited case law that previously established this proposition . . . and rejected the propriety of allowing a defendant to attempt to use cross-examination as a tool to investigate purely speculative sources of witness bias, rather than as a tool to discredit testimony on the basis of [an offer of proof, the record itself, or] a preexisting good faith belief that bias existed." (Citation omitted; internal quotation marks omitted.) *State* v. *Benedict*, 313 Conn. 494, 514, 98 A.3d 42 (2014).

Here the precluded evidence concerns defense counsel's questions of Ettienne: "Then ultimately, you couldn't rule out Rochelle Carmichael as a suspect in this case," and "You continued to investigate her,"

which merely called for yes or no responses. Upon the state's objection to both questions, the defendant made no offer of proof as to what evidence he expected to elicit from Ettienne with respect to this line of questioning. The record also does not reflect any information as to how Ettienne would have answered those questions, what details he would have provided in answering those questions or what type of suspect Carmichael was in this case. See id., 515. "It is therefore impossible to determine whether those details were so important to the defendant's case that their preclusion . . . impaired his constitutional rights." (Internal quotation marks omitted.) Id. Therefore, absent an offer of proof, this court cannot rule on the defendant's claim of error. See *State* v. *Yednock*, supra, 14 Conn. App. 345.

b

The defendant finally argues that the trial court erred in excluding evidence that the police failed to test Carmichael's hands and clothing for gunshot residue, and that such error was not harmless beyond a reasonable doubt. We disagree that the error, if any, was harmful.

Assuming, without deciding, that the trial court violated the defendant's right to present a defense by excluding evidence that the police failed to test Carmichael's hands and clothing for gunshot residue, we consider whether the error was harmless beyond a reasonable doubt. See *State* v. *Santos*, 318 Conn. 412, 425, 121 A.3d 697 (2015). As previously noted, "[i]f the claim is of constitutional magnitude, the state has the burden of proving the constitutional error was harmless beyond a reasonable doubt. . . . Whether a constitutional violation is harmless in a particular case depends upon the totality of the evidence presented at trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . In order to assess the harmfulness of the impropriety, we review the record to determine whether there is a reasonable possibility that the evidence . . . complained of might have contributed to the conviction . . . ." (Citation omitted; internal quotation marks omitted.) Id.

We conclude that the state has proved that any error that the trial court committed in excluding evidence that the police failed to test Carmichael's hands and clothing for gunshot residue was harmless beyond a

reasonable doubt. At trial, the state presented a strong case and, even without the expected negative answer in response to defense counsel's question to Ettienne: "You never tested [Carmichael's] hands or clothes for gunshot residue," that evidence was before the jury. Prior to that question, the following colloquy between Ettienne and defense counsel occurred:

"Q. [W]hen [Carmichael's] apartment was searched, was anything swabbed for gunshot residue?

"A. No.

***

"Q. [W]as she swabbed for gunshot residue?

"A. She was not."

The foregoing testimony establishes that the excluded evidence, that police failed to test Carmichael's hands and clothes for gunshot residue, was cumulative of the evidence already before the jury.[19] Because the record reveals that there was evidence before the jury that the police did not swab Carmichael for gunshot residue, any exclusion of evidence regarding the defendant's claim that the police failed to test Carmichael's hands and clothing for gunshot residue is harmless beyond a reasonable doubt. See *State* v. *Santos*, supra, 318 Conn. 425. Therefore, we conclude that the court did not err in excluding this evidence.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The court vacated the felony murder conviction without prejudice and imposed sentences only upon the other convictions.

[2] When the defendant arrived at the hospital he was wearing a black T-shirt, black sweatpants, Nike sneakers and black socks.

[3] Detective Bertram Ettienne of the New Haven Police Department testified that "Poppy" (really "Papi") is common parlance meaning a Hispanic male.

[4] Ettienne also testified that the phrase "they hit" means "they're done."

[5] The parties stipulated that the defendant did not possess the permit required to carry a pistol.

[6] The colloquy, in relevant part, is as follows:

"[The Prosecutor]: Okay. Did you find any evidence of any kind of cartridge casings, expended bullets, a weapon, any kind of blood, anything like that?

"[Jackson]: No, I did not.

"[The Prosecutor]: You said also that some other police officers came to the scene; is that correct?

"[Jackson]: Yes, another unit did.

"[The Prosecutor]: All right; and what did they do?

"[Jackson]: They actually canvassed from Ellsworth back down to the Boulevard.

***

"[The Prosecutor]: All right. Did anybody find anything?

"[Jackson]: No, sir.

"[The Prosecutor]: Now, you mentioned the soul food restaurant. Was that open when you—when you got there?

"[Jackson]: Yes, it was.

"[The Prosecutor]: All right; and did you happen to go in there?

"[Jackson]: Yes, I did.

"[The Prosecutor]: All right; and what—why did you go in there?

"[Jackson]: I went in there, they had—there was patrons and staff still in there. I entered the restaurant to see if they saw anything or heard anything.

"[The Prosecutor]: All right. Did you gain any information from any-

body there?

"[Jackson]: The only information I got was somebody put—

"[Defense Counsel]: Objection as to what anybody said, Your Honor.

"The Court: Well, I think the answer—the question put can be answered yes or no. Did you get any information? Yes or no?

"[Jackson]: Okay. Yes, I did.

"[The Prosecutor]: Okay."

[7] The following colloquy took place during the direct examination of Jackson, which the defendant now challenges on hearsay grounds:

"[The Prosecutor]: All right. Did you gain any information from anybody there?

"[Jackson]: The only information I got was somebody put—

"[Defense Counsel]: Objection as to what anybody said, Your Honor.

"The Court: Well, I think the answer—the question put can be answered yes or no. Did you get any information? Yes or no?

"[Jackson]: Okay. Yes, I did.

*** 

"[The Prosecutor]: Did anyone say that they had heard or seen any gunshots?

"[Defense Counsel]: Objection as to what anybody said.

"[The Prosecutor]: I think he can answer that yes or no.

"[The Court]: I will again allow that question to be answered yes or no.

"[Jackson]: I'm sorry, could you repeat, sir?

"[The Prosecutor]: Sure. Did anyone say that they had heard or seen any gunshot?

"[Jackson]: No one reported that, sir.

"[Defense Counsel]: I would move to strike, Your Honor. I think the court instructed him to answer yes or no.

"The Court: What is the reason to strike it?

"[Defense Counsel]: Foundation.

"The Court: The answer is no. Well, this is what he heard, so there's certainly foundation; he was there. So with respect—

"[Defense Counsel]: Well, it's hearsay.

"The Court: Well, but nothing was said, so there's no hearsay. Hearsay is an out-of-court statement introduced for proof of the fact asserted. There's no out-of-court statement, therefore, no hearsay. So denied. Proceed."

[8] The Southern Hospitality Soul Food restaurant, where Jackson entered to inquire as to whether any patrons heard or saw gunshots, and D'Amato's Fish Market, which is the area Natale canvassed, are both located in the same building. The following exchange between the prosecutor and Jackson shows the close proximity of the two stores to the location at which the defendant alleged he was shot:

"Q. You're familiar with the Brendan Towers apartment building. . . .

"A. Yes, sir.

"Q. And Brendan Towers apartment, that block is bordered by Ellsworth Avenue . . . .

"A. Yes.

*** 

"Q. All right. This building here that's marked 423-427—

"A. Hm-hmm.

"Q. —are you familiar with that building?

"A. Yes, sir.

"Q. Okay. What's in that building?

"A. That's the building that contains the soul food restaurant and also D'Amato's restaurant.

"Q. D'Amato's? What's that, a fish place?

"A. Yeah, fish—fish restaurant, yes, it is.

"Q. All right. Two storefronts in that building?

"A. Yes.

"Q. All right. Immediately to the east of that building is what building?

"A. That's the building we know as the doctor's building.

"Q. Okay. Between the two buildings, what is there?

"A. It's—it's a driveway that go[es] along the back and turns to the parking lot of the doctor's building.

"Q. All right; and that was the location he told you he had been shot at?

*** 

"A. Actually in front, yes, more along—right there.

"Q. Okay. I've got the cursor on what, the sidewalk?

"A. Sidewalk right next to the street, yes, sir."

[9] The following colloquy took place between Natale and the prosecutor:

"Q. Can you tell us about your conversation with the defendant at the Hospital of St. Raphael?

"A. I tried to gather as much information as I could from him. I asked him what happened, where it happened, and who—does he know who shot him.

"Q. Okay. What responses did you get from the defendant?

"A. Mr. Johnson told me that while he was walking to his—in his own words—his destination while in the area of Whalley and Ellsworth, he heard some gunshots and he was shot.

"Q. And did he tell you what happened after that?

"A. He told me he didn't have a cell phone or anybody to call, so he walked to the hospital.

"Q. Did he give you any specifics as to the location as to where he was shot?

"A. The only thing he told me was that it was in front of D'Amato's Fish Market on Whalley Avenue.

\*\*\*

"Q. After having that conversation with the defendant, did you and anyone else leave the hospital to go somewhere else?

"A. Yes, Detective Zaweski, Wuchek, and I went over to D'Amato's Fish Market on Whalley Avenue.

"[The Prosecutor]: For the record, that's State's [exhibit] 1 on the screen.

"Q. And why did you go over to D'Amato's Fish Market?

"A. We—we went over there to look for any ballistic evidence, the evidence of a shooting, broken windows, blood on the sidewalk, anything that might help us out with the investigation.

\*\*\*

"Q. All right. So what—what else did you do?

"A. We double backed along our steps. One would go one way, then I would go after him after he came back. We would double up. Then we walked around to the corner of Whalley and Ellsworth and checked that side of the building as well.

"Q. All right; and did you find anything?

"A. No, we did not."

[10] The following colloquy took place between Jackson and the prosecutor:

"Q. Okay. Did you find any evidence of any kind of cartridge casings, expended bullets, a weapon, any kind of blood, anything like that?

"A. No, I did not.

"Q. You said also that some other police officers came to the scene; is that correct?

"A. Yes, another unit did.

"Q. All right; and what did they do?

"A. They actually canvassed from Ellsworth back down to the Boulevard.

\*\*\*

"Q. All right. Did anybody find anything?

"A. No, sir.

"Q. Now, you mentioned the soul food restaurant. Was that open when you—when you got there?

"A. Yes, it was.

"Q. All right; and did you happen to go in there?

"A. Yes, I did.

"Q. All right; and what—why did you go in there?

"A. I went in there, they had—there was patrons and staff still in there. I entered the restaurant to see if they saw anything or heard anything."

[11] Jackson, in the presence of the jury, did in fact testify, without objection, that he did get information from the patrons at the restaurant. Specifically, during the prosecutor's direct examination of Jackson, the following colloquy occurred.

"[The Prosecutor]: All right. Did you gain any information from anybody there?

"[Jackson]: The only information I got was somebody put—

"[Defense Counsel]: Objection as to what anybody said, Your Honor.

"[The Court]: Well, I think the answer—the question put can be answered yes or no. Did you get any information? Yes or no?

"[Jackson]: Okay. Yes, I did."

[12] At 7:50 p.m., Troy LeClaire, who lived on the first floor in Brendan Towers, called the police after he heard gunshots and saw Garcia lying in front of his apartment door gasping for air. On that same evening at 8:02 p.m., the police received a report that a gunshot victim, the defendant, had just walked into the emergency room at Yale-New Haven Hospital's St. Raphael campus, which was located near Brendan Towers.

[13] As we discuss in part II of this opinion, Rochelle Carmichael, a resident

of Brendan Towers who was friendly with the defendant and Garcia, testified at the defendant's criminal trial.

[14] The police collected thirty-four DNA samples at the crime scene in Brendan Towers and compared them to known DNA samples from Garcia and the defendant. A partial DNA profile that was extracted from genetic material located on *one* of the fired bullets was consistent with that of the defendant, as well as with that of fifty percent of the black population, and thirty-three percent of the white and Hispanic populations.

[15] Even during the defendant's sentencing proceeding, the court, *Blue, J.*, stated: "This is a case where . . . the evidence is *overwhelming* that you [the defendant] were at the scene . . . that you brought a loaded gun to a marijuana transaction and then you proceeded to use it and killed [Garcia] . . . ." (Emphasis added.)

[16] Moreover, the challenged statements essentially reporting that no patrons in the Southern Hospitality Soul Food restaurant reported hearing or seeing gunshots, had limited probative value. There are a number of reasons why no one would report hearing or seeing gunshots.

[17] The court's instruction relating to third party culpability in its final charge to the jury is as follows: "The defendant argues that there is evidence that a third party, Rochelle Carmichael, committed the crimes with which the defendant has been charged. This evidence is not intended to prove the guilt of the third party, but is part of the total evidence for you to consider. The burden remains on the State to prove each and every element of the offenses beyond a reasonable doubt. It's up to you and you alone to determine whether any of this evidence, if believed, tends to directly connect the third party to the crimes with which the defendant is charged. If, after a full and fair comparison of all the evidence you have left in your mind a reasonable doubt indicating that the alleged third party, Rochelle Carmichael, may be responsible for the crimes the defendant is charged with committing, then it would be your duty to render a verdict of not guilty as to the defendant."

[18] The following colloquy occurred during defense counsel's cross-examination of Ettienne:

"[Defense Counsel]: [W]hen her apartment was searched, was anything swabbed for gunshot residue?

"[Ettienne]: No.

\*\*\*

"[Defense Counsel]: Do you know, were—was she swabbed for evidence of gunshot residue?

"[Ettienne]: She was not.

\*\*\*

"[Defense Counsel]: Then ultimately, you couldn't rule out Rochelle Carmichael as a suspect in this case?

"[The Prosecutor]: Objection.

"The Court: Sustained. This—the witness's opinion as to who may be a suspect or anything, that's just an opinion. This is a fact witness, so sustained.

\*\*\*

"[Defense Counsel]: [Y]ou established that [Carmichael] lived in the building, right?

"[Ettienne]: Correct.

"[Defense Counsel]: That nobody was seen fleeing the scene according to witnesses that you interviewed, right?

"[Ettienne]: Correct.

"[Defense Counsel]: You established that [Carmichael] was in fact at the scene and left the scene of Brendan Towers?

"[Ettienne]: At one point, yes.

"[Defense Counsel]: At one point.

"[Ettienne]: Yes.

"[Defense Counsel]: She had to be escorted back?

"[Ettienne]: Correct.

\*\*\*

"[Defense Counsel]: Well, you established that she lied to you?

"[Ettienne]: Correct.

"[Defense Counsel]: About a variety of things. You never tested her hands or clothes for gunshot residue, and you did continue to investigate her—

"[The Prosecutor]: I'm going to object.

"The Court: Sustained."

[19] Defense counsel was permitted to place relevant facts about Carmichael before the jury. See *State* v. *Wright*, supra, 322 Conn. 290. As the record reveals, there was evidence before the jury to reasonably infer that Carmichael was in fact a suspect. Specifically, there is sufficient testimony about

where Carmichael was the day of Garcia's murder, the phone calls she made and who she was with that day. Moreover, the court provided a third party culpability instruction to the jury.

––––––––––––––––––––––––