******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* BILLY RAY WRIGHT
(SC 19411)

Rogers, C. J., and Palmer, Zarella, McDonald, Espinosa, Robinson and Vertefeuille, Js.

*Argued February 24—officially released August 2, 2016*

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *John Waddock*, supervisory assistant state's attorney, for the appellant (state).

*Lisa J. Steele*, assigned counsel, for the appellee (defendant).

*Opinion*

McDONALD, J. This certified appeal requires us to consider a defendant's rights and obligations when he seeks to advance a theory of defense that the police investigation into the crime with which he was charged was inadequate. The state appeals from the judgment of the Appellate Court, which reversed the judgment of conviction of the defendant, Billy Ray Wright, of murder and remanded the case for a new trial. The Appellate Court held that the trial court violated the defendant's right to a fair trial by limiting his cross-examination of the investigating police officers as to whether the murder investigation conformed to general police practices and/or standard police investigative procedures. *State* v. *Wright*, 152 Conn. App. 260, 269, 96 A.3d 638 (2014). We conclude that, in the absence of a sufficient offer of proof regarding this line of questioning, the trial court's rulings limiting cross-examination to the adequacy of the investigation at hand cannot be deemed improper. We therefore reverse the judgment of the Appellate Court.

The record reveals the following undisputed facts and procedural history. The victim, Ronald Bethea, was shot from behind as he stood a short distance from a small crowd of people outside a New Haven bar just before the bar's closing at 2 a.m. on April 27, 2008. The crowd scattered upon hearing the gunshot. The victim staggered into the bar, collapsed, and lost consciousness. He later died from his wound.

Police officers with the New Haven Police Department arrived at the scene minutes later. The first officers to arrive operated under the assumption that the shooting had occurred inside the bar, based on information to that effect relayed by a dispatcher, the victim's location, and the statements of persons outside the bar. It was only after the department's detectives subsequently arrived and reviewed surveillance video from several cameras positioned inside and outside the bar that it was ascertained that the shooting occurred outside the bar. The investigation that ensued led to the defendant being charged with the victim's murder.

The state's evidence at the defendant's trial consisted entirely of circumstantial evidence. The principal evidence was the surveillance video, which, in grainy images, showed the perpetrator's movements from inside the bar to outside the bar prior to the murder. The surveillance video of activity outside of the bar showed the perpetrator approach two people, give one person a handshake and a sort of hug, walk away after that encounter, approach the victim from behind, and then shoot the victim with a gun hidden under his jacket. Although no witness identified the defendant as the perpetrator from that video,[1] an acquaintance of the defendant, Denard Lester, identified himself as the per-

son on the video being given the handshake and he had made a prior statement under oath that the defendant had given him "dap" (described as a handshake and hug) outside the bar on the evening of the shooting.[2] Another witness corroborated that she was with Lester outside the bar when someone had given Lester "dap" shortly before the shooting occurred. The two owners of the bar identified the defendant and Lester as being present in the bar that evening.

On the first day of trial, the state offered the testimony of four New Haven police officers who responded to or processed the crime scene. On cross-examination, defense counsel sought to question these witnesses regarding their investigation into the murder. The trial court sustained the state's objections to several of defense counsel's questions. These evidentiary rulings form the basis of the dispute in this appeal.

The first witness, Officer David Parker, had attended to the victim and had not played any investigative role in the murder. On cross-examination, defense counsel established that Parker had never relayed to other officers that he had observed people running from the scene upon his arrival, or taken any steps to determine the perpetrator's identity. After defense counsel established that Parker had responded on other occasions to shooting incidents prior to the murder of the victim, the state objected on the ground of relevance when defense counsel asked: "And when you arrived at a shooting, do—do you try to determine whether or not any witnesses were at the scene?" Defense counsel responded: "It's not just what he did, Your Honor, that's relevant. It's also what he didn't do that's relevant." The court sustained the objection.

The second witness, Officer Terrence McNeil, testified that, although he was not instructed to do so, he had made repeated efforts to canvass for potential witnesses upon his arrival at the scene but "nobody wanted to get involved." On cross-examination, defense counsel established that during those canvasses, McNeil had not: (1) asked anyone for identification even though he could have; (2) noted descriptions of people present at the scene; (3) canvassed homes across the street from the bar to ascertain whether anyone had seen anything; or (4) noted the license plate numbers of the vehicles that people leaving the scene had entered. Defense counsel established that McNeil previously had responded to many shootings, and then sought to ask: "And one of the things you want to determine is where the shooting occurred, correct?" The court sustained the state's objection, ruling: "What's relevant is his actions on the evening of April 27, 2008." The court later sustained the state's relevance objection when defense counsel attempted to ask: "Well, this is not a— a reaction that was new to you, people not wanting to get involved, correct?" The court reiterated: "Counsel

it has to be related to this day."

Defense counsel then asked for the jury to be excused. After the court did so, defense counsel argued: "This . . . is not the . . . first shooting [McNeil has] responded to. . . . His investigative skills are honed over thirteen years of experience. What he does relates to that experience. Okay. For me to say to him this is not the first time he's responded to a shooting where people were not cooperative is just preliminary to me asking him well . . . having had people refuse to cooperate in the past have you taken steps to secure that cooperation other than merely asking them to cooperate. I mean it's not as if—it's just what he did at the scene here. When he is confronted with uncooperative witnesses, there are other things he can do in order to secure that cooperation. It's not the first scene where he's gone to where people did not . . . want to get involved." The court responded that questions pertaining to what McNeil did or did not do in connection with this particular investigation were proper, but questions regarding other investigations were not relevant.

Defense counsel requested to make a further offer of proof by questioning McNeil, which the court allowed. Defense counsel then asked McNeil only two questions: "When people tell you that they don't want to cooperate, is there anything you can do to secure that cooperation?"; and "When you are confronted with noncooperation of potential witnesses as you were in this case, can you take any other steps other than merely asking them to cooperate?" The state objected, but noted that it would have no objection to questions limited to the events of April 27, 2008. The court responded that it had understood defense counsel's question to be related to that date. After confirming with defense counsel that he had nothing further, the court recalled the jury.

When cross-examination resumed, defense counsel asked McNeil: "When you are faced with this noncooperation by the people you spoke to, was there anything you could have done in light of that noncooperation to secure their cooperation?" McNeil responded, "No." Defense counsel then attempted to ask: "Well, wouldn't some of the people not want to give you information in front of other people? . . . Is that one of the things you were cognizant of?" The court sustained the state's objection on the ground that the questions called for speculation. Defense counsel then asked in rapid succession, with objections from the state and comments from the court interposed: "Well, if you had [the potential witnesses'] names that you didn't secure and you approached them when they were home and not in front of a crowd of people, is that something that is done . . . on occasion? . . . You couldn't have done that? . . . Some people don't like to give information in front of other people, isn't that correct, Officer?" The court also sustained objections to these questions.

During a subsequent jury recess, defense counsel stated to the court: "In regard to . . . my cross-examination to what was done by the police officers in this case the state is going to get up and argue during closing argument, at least in everything humanly possible, as—and they were unable to have any witnesses, it's not their fault. The fact of the matter is, Your Honor, that they didn't do everything humanly possible. And what they didn't do is as relevant in this case as what they did do because they do not have any eyewitness to this shooting, and what steps they . . . took or didn't take to secure an eyewitness is important. Now, for me not to be able to ask an officer when you . . . canvass a crowd of people and say, does anybody have any information . . . we all know in the real world a lot of people don't come forward to be labeled a snitch in front of a crowd . . . but had he gotten identification, which he could have gotten, then he could have approached these people when they had been alone to try to determine whether or not anybody had seen anything. . . .

"Your Honor, nobody cooperated at the scene but that did not foreclose them from pursuing other avenues with the same people had they gotten their names. And for me not to ask a police officer, isn't it true that some people are not forthcoming in groups but when approached later in a one-to-one situation have provided information? And why didn't you take steps to ensure that you identified those people so you could at a later date go to them outside of a group of people to ask them if they had seen anything? I mean, I . . . don't understand why I would be foreclosed from . . . inquiring as to why [they] didn't do those things."

The court responded: "I made my rulings based on what this witness said here. I don't know what else I'm going [to] hear from detectives who were in charge and investigating this case. But I . . . made my rulings with relevancy with [Officer McNeil] concerning his activities on April 27, 2008. . . . That does not mean if I hear—you know, I don't know what other evidence I'm going to hear from the state and I'm not sure if you are too, about detectives and captains and what their procedure is and was on that particular night . . . but I stand by my rulings . . . ." Defense counsel reiterated his concern that the state would "say the police did everything humanly possible and were unable to develop any witnesses to the shooting," and that he "would like to be able to say, well, they didn't . . . ."

The state's case thereafter resumed with its third witness, Detective Herbert V. Johnson III. Johnson testified that he had arrived at the scene approximately one hour after the shooting and had been assigned specific duties that did not include canvassing witnesses. Defense counsel established that Johnson had not: (1) conducted any type of canvass; (2) inquired as to what

efforts other officers had made to develop potential witnesses; (3) instructed officers to canvass the homes across the street; or (4) attempted to establish a motive for the shooting. Defense counsel was precluded, on the ground of relevance, from asking Johnson as to whether he was "unable to determine whether anybody was outside smoking when the shooting occurred."

The state's fourth witness, Detective Bridgett Brosnahan of the department's Bureau of Identification, had photographed the scene and collected potential physical evidence. On direct examination, Brosnahan testified that she had collected some "fiber-like materials" from the scene. On cross-examination, defense counsel established that those materials had not been tested to determine color or composition, even though they could have been.[3] When defense counsel attempted to ask Brosnahan whether she ever suggests to detectives working a case with her that further testing is necessary, the state sought clarification, saying that it would have no objection if defense counsel was "referring to this case . . . ." Defense counsel responded: "I'm not just asking about this case. . . . I'm asking about general procedures between [the Bureau of Identification] and detectives." The court instructed defense counsel to limit the question "to the events of April 27, 2008."

On the second day of trial, before the jury entered the courtroom, defense counsel expressed his general disagreement with the trial court's rulings of the prior day. Defense counsel argued that he should be able to elicit testimony to demonstrate that the officers could have done more to secure potential witnesses. Apparently in reference to the lead investigating detective, whom defense counsel anticipated would be called by the state to testify that day, defense counsel stated: "I'm going to establish that he is an expert and at that point I think I could ask him hypothetical questions that do not stem from the evidence in this case . . . . I'm going to ask him about isn't it true that certain people cannot come forward and do not cooperate in a group setting, but may be amenable to speaking to the police one-on-one. Isn't it important to establish who was present, at least, to get their names and if they aren't cooperative, go back and speak with them." The court expressed no opinion on defense counsel's proposal, instead addressing another evidentiary matter that had been raised earlier. The state never called the lead detective to testify, and the defense did not seek to proffer the detective as its own witness. The defense offered no other witnesses nor did it attempt to introduce evidence relating to investigative practices or procedures.

The jury found the defendant guilty of murder. The court rendered judgment in accordance with the verdict.

On appeal before the Appellate Court, the defendant

claimed that he had been deprived of his constitutional right to present a defense because the trial court improperly limited the scope of his cross-examination of the investigating police officers regarding the adequacy of their investigation. *State* v. *Wright*, supra, 152 Conn. App. 263. With regard to the issue in this certified appeal, the defendant specifically contended that the trial court improperly had limited his cross-examination of the investigating officers regarding what the officers did or did not do by way of investigation on the night of the murder and precluded his broader inquiry into police procedures generally followed in cases like his. Id., 268–69. The Appellate Court concluded that the defendant had been permitted to inquire into what the officers did not do in his case, but determined that "it was equally important for the defendant to be permitted to bring to the attention of the jury any differences there may have been between what [the officers] did not do in this investigation and general or ordinary police procedures that they had followed in other murder cases." Id., 275–76. The Appellate Court characterized the defendant's questions as seeking "to elicit testimony as to whether the police, in not pursuing certain avenues of investigation or possible procedures, were acting in accord with past practices or with what could be regarded as standard police investigative procedures." Id., 269. The court saw no reason why the police officers could not have been qualified as expert witnesses and asked such questions on the basis of their training and experience. Id., 276. The court held that the trial court's refusal to permit such an inquiry violated the defendant's right to a fair trial and required a new trial in light of the tenuous nature of the state's case. Id., 274, 282.

We thereafter granted the state's petition for certification to appeal to this court, limited to the following issues: (1) "Did the Appellate Court properly determine that the trial court had abused its discretion by precluding the defendant from asking certain questions during cross-examination about the police investigation in this case?"; and (2) "If the answer to the first question is 'yes,' did these evidentiary improprieties deprive the defendant of his constitutional right to a fair trial?" *State* v. *Wright*, 314 Conn. 941, 941–42, 103 A.3d 165 (2014).

The state claims that the Appellate Court's reasoning was flawed in two principal respects. First, it contends that the Appellate Court improperly created a new rule deeming a defendant constitutionally entitled to inquire into police practices and procedures. Second, it contends that, even if a defendant may permissibly inquire into police practices and procedures, in the present case, the defendant failed to make an offer of proof to establish his intention to present a defense that the police had deviated from those practices or procedures, let alone establish that their actions had not conformed to any such practices or procedures.

We disagree with the state that the Appellate Court adopted a per se rule deeming a defendant constitutionally entitled to present evidence that the police investigation failed to conform to standard practices or operating procedures. We read the Appellate Court's decision simply to hold that, under the facts of the present case, the trial court's limitation on cross-examination was of constitutional dimension because it precluded the defendant from placing the police officers' investigation into a meaningful context for purposes of the defendant's inadequate investigation defense. *State* v. *Wright*, supra, 152 Conn. App. 274–76.

We do not consider, however, whether that determination was correct. We conclude that because neither the defendant's proposed questions nor his offer of proof established the basis for a claim that the police, in not pursuing certain avenues of investigation, had failed to act in accordance with past established practices or standard police investigative procedures, he cannot establish that the trial court improperly precluded him from advancing an inadequate investigation defense on this basis.

This court has not previously addressed the parameters of an inadequate investigation defense. Nonetheless, this court has recognized that defendants may use evidence regarding the inadequacy of the investigation into the crime with which they are charged as a legitimate defense strategy. See *State* v. *Collins*, 299 Conn. 567, 599–600, 10 A.3d 1005, cert. denied,    U.S.    , 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011). *Collins* involved a challenge to a jury instruction stating that the ultimate issue to be decided was not the thoroughness of the investigation, but whether the state had proven the defendant's guilt beyond a reasonable doubt. Id. In concluding that the instruction was not improper, we explained: "In the abstract, whether the government conducted a thorough, professional investigation is not relevant to what the jury must decide: Did the defendant commit the alleged offense? Juries are not instructed to acquit the defendant if the government's investigation was superficial. Conducting a thorough, professional investigation is not an element of the government's case. . . . A defendant may, however, rely upon relevant deficiencies or lapses in the police investigation to raise the specter of reasonable doubt, and the trial court violates his right to a fair trial by precluding the jury from considering evidence to that effect."[4] (Citations omitted; internal quotation marks omitted.) Id.; see also *Kyles* v. *Whitley*, 514 U.S. 419, 446 and n.15, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (acknowledging that it is common and accepted tactic for defendants to challenge adequacy of police investigation).

As another court has explained: "[T]he inference that may be drawn from an inadequate police investigation is that the evidence at trial may be inadequate or unrelia-

ble because the police failed to conduct the scientific tests or to pursue leads that a reasonable police investigation would have conducted or investigated, and these tests or investigation reasonably may have led to significant evidence of the defendant's guilt or innocence. A jury may find a reasonable doubt if they conclude that the investigation was careless, incomplete, or so focused on the defendant that it ignored leads that may have suggested other culprits." *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 801, 906 N.E.2d 299 (2009); see also *Sample* v. *State*, 314 Md. 202, 207, 550 A.2d 661 (1988) (explaining that, when "the [s]tate has failed to utilize a well-known, readily available, and superior method of proof to link the defendant with the criminal activity, the defendant ought to be able to comment on the absence of such evidence").

Other jurisdictions have recognized that evidence that the police failed to follow routine practices or standard procedures can be relevant to an inadequate investigation defense strategy. See *State* v. *Hites-Clabaugh*, 251 Or. App. 255, 259–67, 283 P.3d 402 (2012) (concluding that evidence of protocols for investigating sexual abuse cases, to prove that such protocols had not been followed, was improperly precluded). Standard procedures presumably reflect departmental recognition that certain actions are necessary to ensure the integrity of an investigation or are productive insofar as they often yield useful information. Cf. *Commonwealth* v. *Bowden*, 379 Mass. 472, 486, 399 N.E.2d 482 (1980) ("[t]he fact that . . . certain police procedures [were] not followed could raise a reasonable doubt as to the defendant's guilt"). Although perhaps not as weighty evidence as standard operating procedures, routine practices reflect experience that such a practice has reliably produced material information.

A defendant, however, does not have an unfettered right to elicit evidence regarding the adequacy of the police investigation. The reference in *Collins* to "*relevant* deficiencies or lapses in the police investigation" suggests that the defendant must do more than simply seek to establish that the police could have done more. (Emphasis added.) *State* v. *Collins*, supra, 299 Conn. 599; see also *Thompson* v. *State*, 399 A.2d 194, 198 (Del. 1979) ("[The] defendant failed to demonstrate how his witnesses' testimony was relevant and material to that issue. The mere possibility that exculpatory evidence might have been found through a more extensive investigation by the [s]tate is an insufficient demonstration."); *Commonwealth* v. *Silva-Santiago*, supra, 453 Mass. 801 (citing "tests or investigation [that] reasonably may have led to *significant evidence of the defendant's guilt or innocence*" [emphasis added]); *People* v. *Hayes*, 17 N.Y.3d 46, 53, 950 N.E.2d 118, 926 N.Y.S.2d 382 ("[A] criminal defendant does not have an unfettered right to challenge the adequacy of a police investigation by any means available. It is well settled that

[a]n accused's right to cross-examine witnesses . . . is not absolute . . . ." [Citation omitted; internal quotation marks omitted.]), cert. denied sub nom. *Hayes* v. *New York*, U.S. , 132 S. Ct. 844, 181 L. Ed. 2d 553 (2011). Even when such evidence has some probative value, the court must consider "whether the probative weight of the . . . evidence exceed[s] the risk of unfair prejudice to the [state] from diverting the jury's attention to collateral matters." (Internal quotation marks omitted.) *Commonwealth* v. *Alcantara*, 471 Mass. 550, 561–62, 31 N.E.3d 561 (2015); see also *State* v. *Brown*, 273 Conn. 330, 342–43, 869 A.2d 1224 (2005) (trial court reasonably could have determined that questioning police officer about departmental policies regarding use of deadly force and officer's prior use of deadly force under questionable circumstances in other cases potentially would have confused issues and diverted jury's attention to collateral issue of propriety of officer's conduct in light of departmental standards); Conn. Code Evid. § 4-3 (exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time).

All of these factors must be evaluated by the trial court in determining whether the particular inadequate investigation evidence should be admitted. That evaluation necessarily is framed by the theory of the proffering party. It is well settled that "[t]he proffering party bears the burden of establishing the relevance of the offered testimony. Unless a proper foundation is established, the evidence is irrelevant. . . . Relevance may be established in one of three ways. First, the proffering party can make an offer of proof. . . . Second, the record can itself be adequate to establish the relevance of the proffered testimony. . . . Third, the proffering party can establish a proper foundation for the testimony by stating a good faith belief that there is an adequate factual basis for his or her inquiry." (Internal quotation marks omitted.) *State* v. *Benedict*, 313 Conn. 494, 511, 98 A.3d 42 (2014).

In the present case, the defendant first asserts that he "explained [to the trial court] his intent was to establish that the officers had investigated other homicide cases, qualify the officer[s] as . . . expert[s], and then ask whether there were steps the officer[s] had taken in other homicide cases to identify and contact witnesses [who] could have been used in this case." The record is clearly to the contrary.[5]

Although police officers who are properly qualified on the basis of their training and/or experience often are used as expert witnesses; see, e.g., *State* v. *Campbell*, 225 Conn. 650, 655, 626 A.2d 287 (1993); *State* v. *Girolamo*, 197 Conn. 201, 215, 496 A.2d 948 (1985); *State* v. *Cosgrove*, 181 Conn. 562, 587–88, 436 A.2d 33 (1980); the defendant never asked to qualify any of the testifying officers as an expert. Defense counsel only stated during his offer of proof that McNeil's actions were related

to McNeil's "experience," which cannot reasonably be construed as an expression of an intention to qualify McNeil as an expert. By contrast, the day after completion of the testimony of the four officers at issue, defense counsel expressed a clear intention to qualify a prospective police witness as an expert. At that time, defense counsel never indicated that his questions from the prior day were aimed at a similar intent.

The record does not contain sufficient evidence to qualify the witnesses as experts, and the defendant did not seek to elicit information that would have done so. The state elicited testimony on direct examination regarding the length of each officer's tenure. No information was elicited regarding training or duties. The testimony established that Parker and Brosnahan had minimal experience in their positions at the time of the murder, one year and approximately two years, respectively. Although McNeil and Johnson had thirteen and fourteen years with the police force at the time of trial, respectively, the closest the defendant came to building on that information was to establish that McNeil had responded to "many" shootings during his tenure.

The defendant also did not seek to elicit information regarding routine practices or standard police operating procedures for any period of time, let alone the time of the crime. Defense counsel's questions instead asked whether the officer "ever" did something; whether a particular response was "new" to the officer; whether something had been done "on occasion"; and other questions that generally sought information about whether some action previously had been undertaken in some other cases. Defense counsel never asked whether the officer had undertaken the action in question "routinely," "consistently," "regularly," or any term of like effect.[6] Nor did the defendant attempt to introduce documentary evidence or proffer his own witness regarding any police investigative protocols or procedures that have been adopted by national, state, or local law enforcement agencies or organizations.

Most significantly, when the defendant made his offer of proof, he never addressed routine practices or standard operating procedures at the time of the crime. He did not elicit evidence as to the existence of such practices or procedures, the failure to adhere to such practices or procedures, or the possibility that adherence to such practices or procedures could have led to material evidence of the defendant's guilt or innocence. See, e.g., *State* v. *Shaw*, 312 Conn. 85, 106, 90 A.3d 936 (2014) (offer of proof must be sufficient to show that evidence sought to be explored is relevant); *State* v. *Esposito*, 235 Conn. 802, 832–33, 670 A.2d 301 (1996) (defendant, as proffering party, bore burden of making sufficient offer of proof); see also *State* v. *Bova*, 240 Conn. 210, 226, 690 A.2d 1370 (1997) (defendant's offer

of proof failed to establish evidentiary foundation sufficient to support inference establishing relevancy of proffered testimony).

Instead, the defendant's offer of proof consisted only of two questions to McNeil regarding whether McNeil could have done more to obtain cooperation from potential witnesses. Defense counsel's subsequent arguments repeatedly underscored that he wanted to inquire into what the officers had not done in the defendant's case, which he was permitted to do, and what the officers had done in some other investigations, which he was not permitted to do. The latter inquiry is not the same as one directed at establishing that the officers had failed to follow routine practices or standard procedures. Nor is it tantamount to laying a foundation for establishing recognized practices or procedures and a failure to comply therewith. Although defense counsel stated, prior to questioning McNeil for his offer of proof, that his overruled questions had been "preliminary," his questions to McNeil never inquired further into practices or procedures.

Indeed, defense counsel's lone reference to a matter akin to routine practices or standard procedures was a complete non sequitur relating to a witness who was not qualified to offer such testimony. Specifically, in response to the state's request for clarification regarding his question to Brosnahan whether she "ever" suggests to detectives that further testing is necessary, defense counsel asserted that he was asking about "general procedures between [the Bureau of Identification] and detectives." The question plainly did not relate to standard procedures, and defense counsel never rephrased his question to relate to such procedures. Moreover, Brosnahan had a limited tenure with the bureau, and had not been asked about the extent of her experience in a manner that could qualify her as an expert.

The defendant's second argument implicitly concedes the deficiencies in the record. He repeatedly asserts that he "was not allowed to make an offer of proof" and that the "trial court violated [his] constitutional rights . . . by not letting him make a full offer of proof."[7] The record is clearly to the contrary on this point as well.

The trial court permitted the defendant to make an offer of proof through his examination of McNeil, over the state's objection, without limitations. See *State* v. *Esposito*, supra, 235 Conn. 833 (defendant's failure to make sufficient offer of proof not attributable to trial court where court placed no limitations on defendant's offer); cf. *State* v. *Zoravali*, 34 Conn. App. 428, 432–33, 641 A.2d 796 (trial court denied defendant's request to make offer), cert. denied, 230 Conn. 906, 644 A.2d 921 (1994). Defense counsel posed only two questions, which the trial court interpreted to be directed at the

investigation at hand. Defense counsel said nothing to disabuse the court of that impression. The court asked defense counsel whether he had anything further before it recalled the jury. Defense counsel indicated that he did not.

During a subsequent jury recess, defense counsel was permitted to press his argument further. The trial court underscored that the limitations that it had placed on defense counsel's questions were based on the testimony of the particular witness and that witness' role in the investigation at hand. The court expressly left the door open to a broader inquiry when the officers and detectives in charge of the case were called to testify. Defense counsel never argued that officers other than those in a supervisory capacity could competently testify regarding routine practices and standard operating procedures. Nor did he represent a good faith basis to believe that such practices or procedures existed and had been violated. The next day, when defense counsel renewed his disagreement with the limitations imposed on cross-examination the previous day, the trial court did nothing to preclude or limit that argument.

Ultimately, it is the defendant's duty to put the trial court on notice of his defense theory and to ensure that evidence to support that theory is placed on the record for appellate review. See *State* v. *Brunetti*, 279 Conn. 39, 63, 901 A.2d 1 (2006) (requiring defendant "to take the necessary steps to sustain [his] burden of providing an adequate record for appellate review" [internal quotation marks omitted]), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). We recognize that the state repeatedly interrupted defense counsel's questions and argument, which undoubtedly made defense counsel's job more difficult. Nonetheless, defense counsel was permitted to place relevant facts on the record.

Stated simply, the record does not reflect that the defendant expressed an intention to qualify any of the testifying officers as experts and to inquire about standard operating procedures or routine practices that had not been followed in the investigation at hand. Nor does the record establish such facts. The defendant's claim that the trial court improperly precluded his inadequate investigation defense strategy as to such a line of inquiry therefore necessarily fails.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to render judgment affirming the judgment of the trial court.

In this opinion the other justices concurred.

[1] The state's witness from the state forensic laboratory testified that he had been unable to enhance the video to allow identification of the perpetrator. The state maintains in its brief to this court that it had not asked any witness to directly identify the defendant on the video because such an identification would have been improper pursuant to *State* v. *Finan*, 275 Conn. 60, 67, 881 A.2d 187 (2005), in that the perpetrator's identity was an

ultimate issue for the jury.

[2] Lester had made this statement at the defendant's first trial, which ended in a mistrial. At the defendant's second trial, Lester recanted his identification of the defendant.

[3] Defense counsel suggested that the fibers could have come from the shooter's shirt. Brosnahan explained that the fibers had not been tested because there was nothing against which they could be compared.

[4] We upheld the instruction in *Collins* because it did not direct the jury not to consider the adequacy of the investigation. *State* v. *Collins*, supra, 299 Conn. 600–601.

[5] The record similarly refutes the defendant's claim that he was "repeatedly precluded from asking officers about what steps they *could* have taken to identify and contact potential witnesses." (Emphasis added.) The defendant was permitted to ask that question directly, or was permitted to elicit testimony from which the jury reasonably would have inferred that such action could have been undertaken. For example, the defendant was permitted to ask McNeil whether he could have asked for identification from the people he had canvassed, and to ask Brosnahan whether the fiber-like materials that she collected could have been tested for color and composition. In the few exceptions, it would have been a matter of common sense that the officers could have done so. It was obvious, for example, that Johnson, who testified that he had spoken to the bar's security personnel but did not ask them where patrons who wanted to smoke exited the bar, could have asked a question about a smoking exit.

[6] The imprecise phrasing of several questions further muddied the waters. Defense counsel's question to McNeil as to whether, in responding to a shooting "one of the things you want to determine is where the shooting occurred," is unclear as to whether it refers to McNeil's practice or police practices generally. To the extent that "you" would presumably be interpreted to inquire as to McNeil's own practice, McNeil previously had testified that he had been informed by persons outside the bar, as well as dispatch, that the shooting occurred inside the bar, where the victim was found. Thus, such a determination had been made, which later was proven wrong. Moreover, the testimony established that each officer had undertaken different duties, some unconnected to investigation. No testimony established what McNeil's assignment was at this scene, except that his duties did not include canvassing witnesses (but he voluntarily did so), or at other scenes generally.

[7] The defendant similarly presses the argument that the trial court's evidentiary rulings effectively instructed the jury not to consider the adequacy of the police investigation. The trial court, however, instructed the jury that it should not be influenced by the court's rulings on objections. It is well established that in "the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 828, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006).